1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    DANIEL DEMETRIS, et al.,
                                                Case No.  13-cv-05566-VC
            Plaintiffs,
8
     v.                                         **ORDER GRANTING MOTION TO
9                                               DISMISS**
     TRANSPORT WORKERS UNION OF
10   AMERICA, AFL-CIO,                          Re: Dkt. No. 104

11          Defendant.

12

13                                        **I.**

14          This dispute arises out of the American Airlines bankruptcy. During the bankruptcy

15   proceedings, American and the Transport Workers Union of America ("TWU") negotiated new

16   collective bargaining agreements. As part of those agreements, American promised TWU an

17   equity stake in the new entity that would come out of the bankruptcy. TWU had discretion over

18   how to allocate the equity among the workers it represented.

19          After the union received the equity but before the union made any allocation decisions,

20   many senior workers left their jobs at American in exchange for an early separation package.

21   Later, when the union decided how to distribute the equity, it chose not to include the people who

22   had taken early separation.

23          The plaintiffs are all workers who took early separation. They have filed a proposed class

24   action against TWU on behalf of themselves and all other similarly situated TWU members. They

25   contend the union violated its duty of fair representation by declining to distribute some of the

26   equity to workers who took early separation. Because the plaintiffs' allegations do not create a

27   plausible inference that TWU's actions were arbitrary, discriminatory, or in bad faith, TWU's

28   motion to dismiss is granted. Dismissal is with prejudice because the plaintiffs have identified no

United States District Court
Northern District of California

means of curing the defects in the complaint, nor can the Court conceive of any.

## II.

The following allegations are taken from the second amended complaint ("SAC") and the many documents it incorporates.

American Airlines filed for Chapter 11 bankruptcy on November 29, 2011. On February 1, 2012, pursuant to Section 1113 of the Bankruptcy Code, American rejected its collective bargaining agreements with TWU, which represented seven classes (or "crafts") of American employees. Over the next several months American and TWU engaged in extensive negotiations over new CBAs, which were ultimately ratified by five TWU crafts in May 2012 and the remaining two crafts in August 2012.

Under the new CBAs, TWU agreed to a number of concessions which resulted in significant labor cost savings for American. As consideration for these concessions, American agreed to give TWU an equity stake in the company that would emerge from the bankruptcy proceedings. The equity percentage was initially to be 3.1% of the equity granted unsecured creditors, but it was later increased to 4.8% based on an agreement between American and TWU that required American to treat TWU workers comparably to workers represented by other unions when negotiating labor cost concessions. The parties refer to this as the "Me Too" agreement.

The plaintiffs and TWU disagree about precisely which labor concessions were given in exchange for the equity. Both sides agree that 1.7% of the equity was given pursuant to the "Me Too" agreement, as mentioned above. And they agree that two other significant changes were: (1) American's decision to freeze the pension benefits of TWU workers and replace the pension program with a less valuable 401(k) plan for workers who continued with the company; and (2) significant "scope of work" concessions, which changed work rules and allowed American to outsource more work. In a motion for approval of the new CBAs in the bankruptcy proceedings, American stated the equity "represents appropriate compensation for, *inter alia*, very significant scope and pensions concessions," and "the savings resulting from the ability of the Debtors to implement scope changes and freeze the pension plan are important to their long-term viability."

SAC, Ex. 3 at 16-17.[1]

But American also cancelled retiree health benefits for its workers. Under the pre-bankruptcy CBAs, TWU members could participate in a pre-funding program for retiree medical insurance. Employees could contribute a portion of their paycheck each week to a trust, which American would match, with the employee- and employer-funded portions of the trust kept separate. Employees who participated in this program would receive comprehensive retiree health coverage up to age 65, and retirees who were over 65 and enrolled in Medicare received supplemental coverage. In the 2012 CBAs American eliminated these benefits, agreeing to return the employee-funded portion of the employee's trust account back to the employee. According to the SAC, "Refunds of Class Members' employee-funded accounts varied from approximately $5,000-$40,000." SAC ¶ 57.[2] The plaintiffs allege that the cancellation of retiree health benefits was a major labor cost savings for American, and that it was one of the concessions for which equity was granted. For purposes of this motion, the Court accepts the plaintiffs' allegation as true.

Around the time American and TWU were negotiating the new CBAs, TWU also negotiated an early separation program for eligible American employees. Under this program, any TWU-represented employee of American who was at least 45 years old and had 15 years of seniority could voluntarily leave the company in exchange for regular severance pay, compensation for unused vacation time, two weeks' additional pay, and a one-time payment of $10,000 for full-time employees or $5,000 for part-time employees. Further, some employees who had special job protections could receive an additional $12,500 payment.[3] Those who took early separation received payments of somewhere between $27,000 and $48,000, depending on their

---

[1] Both parties also agree the equity was given as settlement consideration for two outstanding TWU grievances – known as 29(d) grievances – one involving overcharges for health insurance premiums, and one involving American's outsourcing of work on several 757's.

[2] The status of what American will do with the employer-funded portion of the employee trust account is still being litigated in bankruptcy court.

[3] There was a similar program for more junior employees who did not meet the age and seniority requirements. They could elect a voluntary furlough but could not receive the special severance payment or the extra two weeks' pay.

United States District Court
Northern District of California

United States District Court
Northern District of California

situation. *See* RJN, Ex. 1. The deadline to enroll in early separation ranged from September to October 2012. Those who enrolled in early separation created cost savings for the company and helped avoid involuntary furloughs of more junior employees. Participation in the program was voluntary.

In late August 2012, after the ratification of the new CBAs but before the early separation deadline, TWU and American entered into a letter agreement which gave TWU the promised 4.8% equity. The letter agreement included a list of outstanding TWU claims and grievances that were released in exchange for the equity, but it did not allocate portions of the equity to any particular claim, nor did it contemplate that TWU would allocate the equity in a certain way. TWU had sole discretion over how to allocate the equity to its members.

On March 27, 2013, TWU President James Little established an "Equity Distribution Committee" to determine how to allocate the equity among TWU members. The committee met multiple times, hired an economist to advise on the creation of a distribution methodology, and determined that the distribution plan "should reflect the origins of the various components of the 4.8%." SAC, Ex. 12 at 3. On May 23-24, 2013, the committee produced a draft equity distribution plan. The plan specified that to be eligible to receive equity an employee must, subject to a few exceptions, have been employed by American at the date of the bankruptcy filing (November 29, 2011), and must also have been employed at a cutoff date selected by TWU (July 26, 2013). This meant early separation participants were deemed ineligible to receive a share of the equity, because their employment status had changed before July 26, 2013.[4]

The committee presented the draft plan to the TWU membership through various communications and in a series of "roadshow" meetings. At these meetings many TWU members spoke against the plan and argued it was unfair to exclude early separation participants from a share of the equity. On July 26, 2013, the committee voted 5-4 to approve the plan. Following that vote, the TWU AA Presidents Council, a group consisting of the presidents of TWU local unions,

---

[4] Early separation participants were, however, eligible to receive a share of the $16 million in equity which was given to satisfy the two 29(d) grievances if they were affected by those grievances.

voted to give final approval.

The plaintiffs, all of whom were TWU-represented employees who took early separation, have now brought this lawsuit, alleging that TWU breached the duty of fair representation.

## III.

A union cannot be found to violate its duty of fair representation unless its conduct was arbitrary, discriminatory, or in bad faith. *See, e.g.*, *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 75-76 (1991); *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). A union's action is only arbitrary if it is "so far outside a 'wide range of reasonableness' that it is wholly 'irrational.'" *O'Neill,* 499 U.S. at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). Discriminatory conduct must be "invidious" to breach the duty of fair representation, *id.* at 81, meaning that the conduct "arises from animus or prejudice." *Jeffreys v. Commc'ns Workers of Am.*, 354 F.3d 270, 276 (4th Cir. 2003) (citing *O'Neill*, 499 U.S. at 81). And a bad faith claim requires that a union acted with fraud or an intent to deceive. *See Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 299 (1971).

"Plaintiffs alleging a breach of the duty of fair representation have a high bar to meet." *Gullaksen v. United Air Lines*, _ F.Supp.3d _, 2014 WL 4635184, *3 (D.D.C. Sept. 17, 2014). On a motion to dismiss the question is whether the complaint contains enough factual allegations to make it plausible that the union's conduct was arbitrary, discriminatory, or in bad faith. *See Vaughn v. Air Line Pilots Ass'n*, 604 F.3d 703, 709 (2d Cir. 2010).

## IV.

The plaintiffs allege TWU violated its duty of fair representation in three ways. First, they allege TWU acted in bad faith in its communications about the early separation program prior to the enrollment deadline in September and October 2012, essentially misleading members into believing that taking early separation would not preclude them from receiving a share in the equity. Second, the plaintiffs allege the Equity Distribution Committee's ultimate decision in mid-2013 to exclude early separation participants from any equity share was itself arbitrary. Third, they allege the committee's ultimate decision was borne of a discriminatory motive, namely, to manipulate the results of a representation contest between TWU and another union.

United States District Court
Northern District of California

United States District Court
Northern District of California

## A.

The plaintiffs' contention that the union acted in bad faith when communicating with its members about the early separation plan in Fall 2012 takes two forms. First, the plaintiffs persist in the allegation, contained in the prior version of the complaint, that the union had already decided by Fall 2012 that early separation participants would be excluded from a share in the equity, and that it deliberately concealed this decision from its members (presumably to trick them into taking early separation). Second, the plaintiffs appear to argue that even if the union did not intend to mislead members about the consequences of taking early separation, its communications to its members were nonetheless misleading in a way that reflected bad faith.

With respect to the first point, the Court's prior dismissal order stated that the plaintiffs' first amended complaint "contains no allegation that would support a conclusion that, at the time members were signing up for early separation, TWU's decisionmakers had formed an intent to exclude those people from the equity distribution." Dkt. No. 84. The SAC contains more details, but those details undermine rather than support the plaintiffs' allegation of bad faith. The SAC and its exhibits confirm that: (1) TWU had not made a decision about equity distribution when the plaintiffs enrolled in early separation in September and October 2012; (2) TWU told its members that it would form a committee at a later time to make that decision; (3) this committee did not meet until April 2013; and (4) the committee cast a final vote on the equity distribution plan in July 2013. Nothing in the SAC or its exhibits suggests TWU officials had made anything resembling a plan about equity distribution prior to the formation of the Equity Distribution Committee.

With respect to the plaintiffs' argument that the union affirmatively misled members without the intent to do so, it is not clear how this could constitute "bad faith" within the meaning of the duty of fair representation. *See Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532 (D.C. Cir. 1994) (stating that a duty of fair representation bad faith claim requires showing "a union's actions toward unit employees to be sufficiently egregious or so intentionally misleading [as] to be invidious"). But in any event, the SAC and its exhibits do not support the plaintiffs' contention that the union misled its members. In a September 27, 2012

letter to all members, the union stated that the complicated issue of equity distribution had yet to be resolved, and in particular that it did not know whether people who took early separation would be entitled to a share. For example, the letter included the following language:

> If I am debating whether to retire now, what role should the equity play in my decision?
>
> Throughout this entire [*sic*] we have respected that those decisions are personal and we never given any advice. It's your decision. We can say that the equity piece is very much undetermined at this point [*sic*] is that we will share details as soon as they are available.

SAC, Ex. 1 at 6. And in a different part of the letter, TWU further emphasized that the equity allocation decision had not been made, noting that it would be affected by many variables, including whether a member enjoyed active status. The letter stated: "Once the value is known, and the form in which that equity comes, the TWU will put forth a plan of distribution. These are complicated plans the design of which must consider many variables (e.g. past earnings, active status, stock versus cash distribution, tax matters, merger with another airline, the claims we waived, etc.)." *Id*.

The plaintiffs ignore the above-referenced language and point to a different part of the letter, in which members were told that "this asset [i.e., the equity] belongs to you and will be distributed to you." *Id*. at 4. But when this broad statement is considered in the context of the more specific warning that taking early separation could affect the ability to receive equity, it cannot plausibly be considered a promise that all recipients of the letter would get an equity share.

The plaintiffs point to two other allegedly bad faith communications. First, President Little, in late September 2012, allegedly told Local 514 members in Tulsa, Oklahoma that all TWU members as of September 12, 2012 would receive a share of the equity, and second, Local 591 shop steward John Young allegedly told several named plaintiffs in New York the same thing. But the SAC contains no allegations that these comments were intentionally designed to mislead TWU members, much less that they were "sufficiently egregious or so intentionally misleading [as] to be invidious." *Int'l Union of Elec.*, 41 F.3d at 1539. The SAC's failure in this regard is particularly stark given the one verifiable example of a communication between the union and its members that the plaintiffs have actually provided, namely, the above-referenced letter specifying that no

7

decision had been made about equity distribution in general or about workers taking early separation in particular. Considered in connection with that letter, the only plausible interpretation of Little and Young's alleged statements is that they were aspirational or erroneous, neither of which could give rise to a bad faith claim against the union itself. Accordingly, the plaintiffs have failed to plausibly allege that TWU acted in bad faith in its communication with early separation participants concerning the equity distribution.

## B.

The plaintiffs' primary allegation is that the union's ultimate decision to exclude people who took early separation was arbitrary. This is so, they contend, because the concessions the union gave in exchange for the 4.8% equity stake in the new company harmed the early separation participants as much, if not more, than the people who continued working at American.

The Court previously dismissed this claim as too conclusory, "primarily because the complaint does not permit the Court to assess the degree to which the separated workers were situated differently from the remaining workers with respect to the concessions for the equity share." Dkt. No. 84. The SAC cures this problem by providing a much more detailed explanation of how separated workers (and, for that matter, all workers) were adversely affected by the bankruptcy (and by events leading up to the bankruptcy). But these details only confirm that the union's decision to exclude people who took early separation did not fall so far outside the range of reasonableness as to be arbitrary.

The plaintiffs cannot reasonably dispute that separated workers were differently situated from workers who stayed on the job. American promised TWU a 4.8% equity share in exchange for new collective bargaining agreements that would govern the relationship between the workers and the new company going forward. People who stayed with the company would be required to work under those conditions; people who took early separation would not. And workers who opted for early separation would receive a lump-sum payment of between $27,000 and $48,000; workers who continued on the job would not.

But this actually understates the degree to which these two groups of workers were differently situated. As a matter of logic, it is reasonable to assume that workers who were able to

take early separation had come out of the bankruptcy in a better overall position than those who could not take early separation. All early separation participants were at least 45 years old and had at least 15 years of service. This means they had accrued at least 15 years' worth of pension benefits – benefits that were not, in contrast to other bankruptcies, lost in the reorganization. It is reasonable to assume that workers who had accrued at least 15 years of pension benefits faced a more secure future than their junior counterparts. The union could reasonably conclude that people who could count on a meaningful pension for the rest of their lives – and who would receive between $27,000 and $48,000 in early separation payments – were less in need of an equity share than people who faced a much more uncertain future coming out of the bankruptcy.

The plaintiffs insist that people who took early separation were worse off than the people who continued to work, because the people who stayed on the job would be able to continue earning wages, and would be able to participate in a 401k plan. As counsel for the plaintiffs repeatedly stated at the hearing on this motion to dismiss, "I'd rather be working." But this argument is based on a false premise. It assumes people were forced to take early separation, which is not true. The people who took early separation chose to do so. It is rational to assume they made this choice because it was the best one for them under the circumstances. And it is rational to assume they could *afford* to make this choice because they faced a more secure financial future than the people eligible for early separation who chose to continue working (or, for that matter, the people who had no choice but to continue working because they were not eligible for the early separation program).

To say that the decision to exclude workers who took early separation was rational is not to say it was a perfect decision or even a particularly good decision. After all, as the SAC alleges, all workers employed as of the date of the bankruptcy filing lost the right to participate in American's retiree health benefit program, and this harmed the separated workers just as badly – and perhaps worse – as those who stayed on the job. And all workers, whether or not they took early separation, lost the opportunity to continue working under the conditions that existed prior to the bankruptcy (which included pension accrual and participation in a retiree health benefit program). But in deciding who would receive an equity share, TWU had to draw the line somewhere, and as

9

United States District Court
Northern District of California

discussed above, there are justifications for the union's decision to exclude separated workers that prevent this Court from concluding it was irrational.

This is underscored by an examination of the potential alternatives, which would have had their own problems. Take, for example, the solution the plaintiffs advocate – awarding some share of equity to those who took early separation. For the reasons discussed above, this solution would arguably have been unfair to those who did not qualify for early separation. A person with, say, five years of service did not have the opportunity to accrue nearly the same amount of pension benefits as someone with, say, 20 years of service, and was therefore likely to be facing a much less secure retirement. The person with five years of service could object – perhaps more strenuously than the plaintiffs are objecting now – that it would be unfair to give a person with 20 years of accrued pension benefits both a severance payment *and* a share of the equity in the new company.[5]

What's more, a decision by the committee to award equity to early separation participants, but not to all others who voluntarily left after the bankruptcy filing but before July 2013 (presumably because they had not been at the company long enough to qualify for early separation or had left before the early separation package was offered), could have created additional problems. This is illustrated by three letters attached to the SAC. On July 18, 2013, then-President Little sent a letter to the Presidents Council, arguing it was unfair to exclude early separation participants from at least the 1.7% share of the equity attributable to the "Me Too" Agreement. SAC, Ex. 13. The next day, Gary Peterson, a member of the Equity Distribution Committee, responded to Little, stating:

> The committee met multiple times through out the previous weeks and was tasked with making a very difficult choice. One thing that was legally determined was that the committee could not simply make an arbitrary decision and only give the equity to the Early Outs; we would also need to include all others who left the company 'voluntarily' since that was the basis for our decision.

SAC, Ex. 14. Little recognized this concern, stating in his response:

---

[5] One could also imagine a protest from people who remained on the job that employees usually receive equity in their company as an incentive to help the company succeed, and that people who took early separation did not need to be given such an incentive.

> I was not at all trying to say that there was something unlawful about excluding the early-outs – and others who left AA prior to July 26, 2013 – from the equity distribution. I am aware that our attorneys have given the opinion that it was the possible distinction between the early-outs and others who left that seemed arbitrary and perhaps actionable as a result, not the decision which decided to treat all pre-July 26 voluntary departures as not eligible to receive an equity share.

SAC, Ex. 15. At the hearing on the motion to dismiss, the Court asked counsel for the plaintiffs to explain how it could be rational or appropriate to exclude someone who voluntarily left the company during the eligibility period but *didn't* receive the severance payment, while including someone who left the company during the same period but *did* receive the severance payment. Counsel did not provide an explanation, resting instead on the notion that he only represented the people who took early separation. This answer is unsatisfying, because as the letter exchange between Little and Peterson shows, a decision to include workers who took early separation while excluding other workers who voluntarily departed during the eligibility period could have given rise to a lawsuit of its own.

This leads to the question whether the committee should have drawn a line in yet a different place, awarding equity to all people who were working for American at the time of the bankruptcy filing in November 2011. But the allegations in the SAC indicate this would involve a degree of unfairness as well. The SAC repeatedly alleges – and there is support for this in some of the attached documents – that American gave TWU the equity in exchange for concessions workers had given since as far back as 2003. For example:

- "From 2003-2011 Class Members worked at American under severely concessionary Collective Bargaining Agreements ('CBAs'), making substantial wage, benefit, and work-rule concessions to keep the airline out of bankruptcy . . . These sacrifices gave rise to substantial claims and grievances, in which all TWU-represented employees at American . . . had an equitable stake." SAC ¶ 2.

- "All TWU members, however, including the class members, had made sacrifices from 2003 onward to obtain and retain scope rules preserving work, giving them an equitable stake in the scope concessions." SAC ¶ 47.

- "The final Equity Distribution Plan begins by acknowledging the 'substantial

11

1        concessions to American Airlines in 2003' and the 'additional concessions and

2        trade-offs in collective bargaining in order to obtain and retain the work

3        preservation rules' that TWU members made from 2003-2011. Thus, the Plan

4        recognizes the Bankruptcy concessions were part of a long history of TWU

5        concessions dating back to 2003." SAC ¶ 124.

6  In light of these allegations, people who worked for American any time after 2003 – even if they

7  left before the bankruptcy – would be able to make a reasonable case for a share of the equity.

8       In short, TWU faced a difficult decision about how to allocate the equity, and any possible

9  resolution would have had its flaws and its detractors. All workers were harmed by American's

10  bankruptcy and the resulting concessions, but not all workers were situated similarly. The

11  committee's decision to draw the line as it did was not so far outside the range of reasonable

12  choices as to be irrational.

13       As a final matter, although this is far from dispositive, there is no indication that the union

14  failed to give this difficult issue careful consideration. To the contrary, the SAC and its exhibits

15  show that the decision was the result of a lengthy process that involved input from TWU

16  members. The union hired an economist to assist the committee in creating a draft equity

17  distribution plan. It then presented the draft plan to the membership in a series of roadshow

18  meetings (where, according to the SAC, TWU members expressed strong views on both sides of

19  the question). And after the committee approved the plan itself, it presented the plan to the TWU

20  Presidents Council for final approval. This type of process, coupled with a substantive decision

21  that appears well within the range of reasonableness, makes it implausible that TWU acted

22  arbitrarily in choosing to exclude separated workers from a share of the equity.[6]

23

24  [6] The plaintiffs allege TWU acted in bad faith when the Presidents Council voted on the equity
distribution plan. The plaintiffs allege that only one Presidents Council member who was not

25  already on the Equity Distribution Committee voted to give final approval, and therefore the full
Presidents Council did not have a real opportunity to discuss and vote on the plan. According to

26  the SAC, "this failure to present the Plan to the full Presidents Council for consideration was
improper, showing bad faith political maneuvering and discriminatory intent by the 5 controlling

27  committee members against the Class Members." SAC ¶ 118. But this allegation is conclusory,
and provides no facts to suggest the controlling members engaged in a nefarious scheme to rush a

28  vote by the Presidents Council or to prevent Presidents Council members who opposed the
distribution plan from attending the meeting.

United States District Court
Northern District of California

## C.

The plaintiffs have also alleged that TWU discriminated against them to curry favor with people who stayed on the job, so that those people would support TWU in an ongoing representation contest between TWU and the Teamsters. In its prior order, the Court dismissed this claim because the allegations supporting it were conclusory. Dkt. No. 84. Although the SAC has included more detail about the Teamsters' campaign to displace TWU as the collective bargaining representative for American Airline workers, the plaintiffs' assertion of a link between that campaign and TWU's decision to exclude separated workers from an equity share remains equally conclusory. Indeed, several allegations undermine the plaintiffs' theory of discriminatory animus. First, according to the SAC, the committee chose to award an equity share "to employees who had died or been injured on the job." SAC ¶ 102. Obviously people who had died could not vote in a future representation election, so under the plaintiffs' theory, there would be no reason to include them in the distribution. Second, the committee chose not to award equity to anyone who joined American after the July 26, 2013 cutoff. But those people would be eligible to vote in future elections, so one would expect them to receive equity if TWU's purpose was to secure more support among voting members. Finally, the SAC alleges the Teamsters were attempting to collect representation cards from TWU members in May and June 2013, around the same time that TWU was presenting the draft equity distribution plan in its roadshow meetings. But apparently a number of early separation participants were still working for American at that time. SAC ¶ 111. If TWU was distributing equity based on a desire to curry favor with people who could vote in a representation election, one would have expected it to award a share to everyone who remained on the job, including the people who had opted for early separation but had not yet departed. This renders the plaintiffs' speculative and conclusory allegation of discriminatory motive all the more implausible.

**IV.**

The factual detail contained in the SAC and its exhibits render implausible the allegation that TWU acted arbitrarily, discriminatorily, or in bad faith. Accordingly, the motion to dismiss is granted. And because the plaintiffs have not identified any cure for the defects in the SAC, dismissal is with prejudice.

**IT IS SO ORDERED**.

Dated:  February 4, 2015

_____
VINCE CHHABRIA
United States District Judge